## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DENISE WOLFGRAM-KENNEDY,

    **Plaintiff,**

    v.                                **Case No. 19-CV-774**

ANDREW M. SAUL,
**Commissioner of Social Security,**

    **Defendant.**

## DECISION AND ORDER

Denise Wolfgram-Kennedy seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for a period of disability and disability insurance benefits. For the reasons below, the Commissioner's decision will be reversed and the case remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

## BACKGROUND

Wolfgram-Kennedy filed an application for a period of disability and disability insurance benefits alleging disability beginning on June 26, 2009 due to pain in her back, hip, knee, and neck; headaches; left foot problems; a spur on her right heel; and muscle spasms in her lower back and both legs. (Tr. 302.) Wolfgram-Kennedy's application was denied initially and upon reconsideration. (Tr. 13.) Wolfgram-Kennedy filed a request for a hearing and a hearing was held before an Administrative Law Judge ("ALJ") on February 26, 2018. (Tr. 30–61.) Wolfgram-Kennedy testified at the hearing, as did Douglas Prudin, a vocational expert ("VE"). (*Id.*)

In a written decision issued July 31, 2018, the ALJ evaluated the record from the alleged date of onset to the date last insured of December 31, 2014. (Tr. 15.) The ALJ found that Wolfgram-Kennedy had the following severe impairments: posttraumatic osteoarthritis of the left wrist; degenerative disc disease of the lumbar and cervical spine; obesity; chronic pain disorder; left hip osteoarthritis; venous insufficiency; bilateral carpal tunnel syndrome status-post bilateral release surgeries; asthma; major depressive disorder; bipolar disorder; and anxiety. (Tr. 16.) The ALJ further found that Wolfgram-Kennedy did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"). (Tr. 16–18.) The ALJ found that Wolfgram-Kennedy had the residual functional capacity ("RFC") to perform a range of sedentary work with the following limitations: frequently finger and handle; avoid exposure to concentrated amounts of fumes, odors, dusts, gases, poor ventilation, and other pulmonary irritants; avoid hazardous environments such as open, unprotected heights or around dangerous moving machinery; and limited to simple, routine jobs with few, if any, changes in work processes, settings, or procedures. (Tr. 18–22.)

While the ALJ found that Wolfgram-Kennedy was unable to perform any of her past relevant work, the ALJ found that given Wolfgram-Kennedy's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that she could perform. (Tr. 22–24.) The ALJ therefore found that Wolfgram-Kennedy was not disabled from her alleged onset date through December 31, 2014. (Tr. 24.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Wolfgram-Kennedy's request for review. (Tr. 1–6.)

# DISCUSSION

## *1.    Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported her decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## *2.    Application to this Case*

Wolfgram-Kennedy argues that the ALJ failed to: (1) properly weigh the opinion of her treating medical provider, Dr. Debora Bensi, and (2) support the Step Five determination

that there was a significant number of jobs in the national economy that she could perform. (Docket # 19.)

### 2.1    Weight Given to Treating Medical Provider

Wolfgram-Kennedy argues that the ALJ erred in assigning little weight to the opinion of her primary care provider, Dr. Debora Bensi. (*Id.* at 14–21.) I agree that the ALJ did not support her decision to discount Dr. Bensi's opinion with substantial evidence, and that therefore the decision must be reversed.

An ALJ must consider all medical opinions in the record, but the method of evaluation varies depending on the source. Generally, more weight is given to the medical opinions of treating sources. 20 C.F.R. § 404.1527(c)(2).[1] If the opinion of a treating source is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record, the opinion is given "controlling weight." *Id.* Even if the ALJ finds that the opinion is not entitled to controlling weight, she may not simply reject it. SSR 96-2p. Rather, if the ALJ finds that a treating source opinion does not meet the standard for controlling weight, she must evaluate the opinion's weight by considering a variety of factors, including the length, nature, and extent of the claimant and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. 20 C.F.R. § 404.1527(c).

---

[1] On January 18, 2017, the SSA published the final rules entitled "Revisions to Rules Regarding the Evaluation of Medical Evidence" in the Federal Register (82 FR 5844). The final rules became effective on March 27, 2017. For claims filed before March 27, 2017, however, the SSA continues to apply the prior rules that were in effect at the time of the ALJ's decision. https://www.ssa.gov/disability/professionals/bluebook/revisions-rules.html (last visited June 4, 2020).

Case 1:19-cv-00774-NJ    Filed 06/05/20    Page 4 of 11    Document 26

The ALJ must always give good reasons for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. The ALJ must give reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. An ALJ can reject a treating physician's opinion only for reasons supported by substantial evidence in the record. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

Wolfgram-Kennedy established care with Dr. Bensi on August 8, 2013. (Tr. 477–79.) On September 18, 2017, Dr. Bensi filled out a Physical Work Capacity & Pain Questionnaire regarding Wolfgram-Kennedy. (Ex. C10F, Tr. 1612–27.) She stated that she had been treating Wolfgram-Kennedy since August 8, 2013 and saw her three times per year on average. She listed Wolfgram-Kennedy's diagnoses as bipolar disorder, congestive heart failure, cervical spondylosis, lumbar spondylosis with radiculopathy, neuropathy, moderate persistent asthma, osteoarthritis, and bilateral carpal tunnel syndrome. (Tr. 1619.) Dr. Bensi opined that Wolfgram-Kennedy had very restrictive postural and manipulative limitations. For example, Dr. Bensi stated that Wolfgram-Kennedy could use her hands 10% of the time, fingers 10% of the time, and arms 5% of the time. (Tr. 1614.)

The ALJ assigned little weight to Dr. Bensi's opinion, explaining that although Dr. Bensi was a treating source, her opinion was not supported by her treatment notes or consistent with the overall evidence prior to December 2014. (Tr. 22.) The ALJ explained that although Dr. Bensi's treatment notes at times showed abnormalities, "the doctor routinely found the claimant in no distress or no acute distress, a finding inconsistent with the debilitating limitation she opined." (*Id.*) The ALJ pointed out that Dr. Bensi's treatment notes showed that Wolfgram-Kennedy had normal coordination, no cranial nerve deficit, and at

5

times no tenderness, normal motor function, and normal sensory function. (*Id.*) The ALJ continued:

> The limitations offered by Dr. Bensi are out of proportion to the objective findings seen in her treatment notes, and they are inconsistent with the claimant's own reports of activities prior to December 2014. In particular, the doctor indicated the claimant could use the hands and arms only five to 10 percent of the time, yet the claimant reported engaging in activities including canning, sewing, beading, jewelry making, crocheting, and using a computer—activities which require significant use of the hands. Because this opinion is not supported by or consistent with the evidence of record, the undersigned give it little weight.

(*Id.*)

The ALJ's finding of inconsistency between the evidence and Dr. Bensi's opinion about Wolfgram-Kennedy's abilities is not supported by substantial evidence. The ALJ relied on Wolfgram-Kennedy's reports of engaging in certain leisure activities to discount Dr. Bensi's opinion but failed to consider Wolfgram-Kennedy's reported difficulties in performing these activities. At a hearing in 2012, Wolfgram-Kennedy testified that although she enjoyed fishing, she needed someone else to reel in the fish, and she could crochet only ten minutes at a time before losing feeling in her fingers. (Tr. 77, 81.) At the 2018 hearing, Wolfgram-Kennedy testified that she did do crafts during the relevant period, but that by 2014 she was doing less due to increasing pain and numbness. (Tr. 45, 47.) She explained that in 2014 she would crochet for maybe an hour and a half and then she would have to wait two or three hours before she could feel the needle and thread again. (Tr. 47.) Not long after the close of the relevant period, she stopped doing small needlepoint and crocheting entirely because of difficulty using her hands. (Tr. 45.) Supporting these statements, in her Adult Functional Report of January 10, 2015—just after the close of the relevant period—Wolfgram-Kennedy indicated that her hobbies and interests included crocheting, fishing, reading, making jewelry,

6

and sewing, but that she did these activities only twice a week and it took her a long time to finish a project because she had to stop due to pain. (Tr. 314.) In 2013 and 2014, Wolfgram-Kennedy also repeatedly reported to her physical therapist that she had bilateral arm tingling and numbness to the fingertips with activities like using a computer mouse or reading, which resulted in functional limitations with respect to those activities. (Tr. 491, 492, 512, 516–17.) Because the ALJ ignored significant evidence that Wolfgram-Kennedy was limited in the extent to which she could perform these activities, her decision to give little weight to Dr. Bensi's opinion as inconsistent with those activities is not supported by substantial evidence. *Cf. Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (ALJ's assessment of subjective complaints based on performance of household duties improperly disregarded evidence of claimant's limitations in performing those activities).

In addition to the improper reliance on Wolfgram-Kennedy's reported activities without considering her reported limitations in those activities, the ALJ failed to account for other records from the latter part of the relevant period that might have supported the extreme limitations Dr. Bensi suggested. Notably, Wolfgram-Kennedy underwent at least five surgical procedures on her wrists and arm between 2012 and 2014. On May 18, 2012, she had surgery on her left wrist to remove broken hardware that had been inserted after a 2004 fracture. (Tr. 487.) She also underwent carpal tunnel release surgery on the right wrist at that time. (*Id.*) Afterward, Wolfgram-Kennedy reported left wrist pain and numbness. (Tr. 579.) An MRI on September 28, 2012 showed posttraumatic osteoarthritis of the radial carpal joints, positive ulnar variance with probable ulnar impaction, probable tear of TFCC (triangular fibrocartilage complex), and mild DISI (dorsal intercalated segment instability). (Tr. 579–80.) On November 5, 2012, Wolfgram-Kennedy underwent a midcarpal arthroscopy and ulnar

7

shortening on the left side. (Tr. 487.) In 2013, x-rays on Wolfgram-Kennedy's left wrist and forearm showed a chronic fracture with delayed union and significant intraarticular stepoff, radiocarpal joint space narrowing, and arthritic changes within the wrist. (Tr. 586–87, 589–90, 591–92.) In October 2013, Wolfgram-Kennedy saw Dr. Allan J. Moede for increasing distal radius pain. (Tr. 486.) She reported constant significant pain over the distal radial ulna joint and sharp shooting pains radiating up the arm, as well as numbness and tingling in the fingers. (*Id.*) Dr. Moede identified moderate hypermobility of the distal radial ulnar joint and bony crepitation with positive grind, and noted that x-rays showed irregularity and joint space narrowing in the radiocarpal joint and changes at the radial ulnar joint. (*Id.*) Dr. Moede recommended a trial of radial ulna joint injection, which did not alleviate her symptoms. (*Id.*) Dr. Moede referred her to another physician for further evaluation and treatment of suspected distal radial ulna arthritis. (*Id.*)

Also in 2013, Dr. Bensi referred Wolfgram-Kennedy to Dr. Merle L. Teetzen for a neuropathy evaluation. (Tr. 479.) Dr. Teetzen examined Wolfgram-Kennedy on September 18, 2013 and noted decreased pinprick sensation at the hands. (Tr. 482.) On April 17, 2014, Wolfgram-Kennedy reported to Dr. Teetzen that her hands were very weak and numb, and she could not open jars or bottles. (Tr. 532.) Dr. Teetzen ordered a wrist splint and indicated that the numbness and tingling in her hands may be due to carpal tunnel syndrome. (Tr. 534.) On May 13, 2014, Wolfgram-Kennedy told Dr. Teetzen that her hands were tingling all the time, and she was dropping things and knocking things over. (Tr. 540.) Dr. Teetzen reviewed the results of an EMG of the upper extremities showing mild bilateral carpal tunnel syndromes and indicated Dr. Chen would follow up on it. (Tr. 541, 543.) Dr. Chen performed local injections that helped for about four days. (Tr. 549.) By June 18, 2014, Wolfgram-

8

Kennedy reported to Dr. Teetzen that her hands were numb all the time, her strength was poor, and she dropped things frequently. (*Id.*) Dr. Teetzen measured her power of grasp as seven pounds with the right hand and 18 pounds with the left hand. (Tr. 552.) On September 8, 2014, Wolfgram-Kennedy again followed up with Dr. Teetzen for the numbness and tingling of her hands. (Tr. 568–73.) He evaluated a power of grasp of 25 pounds with the right hand and 25 pounds with the left. (Tr. 761.) On September 18, 2014 and October 2, 2014, Wolfgram-Kennedy underwent surgery for bilateral carpal tunnel syndrome. (Tr. 632–37, 638–47.)

In sum, for the period between 2012 and the end of 2014, there is significant evidence supporting Dr. Bensi's opinion about Wolfgram-Kennedy's manipulative limitations that the ALJ failed to account for when weighing Dr. Bensi's opinion. Undoubtedly, there is a dearth of evidence supporting extreme manipulative limitations prior to 2012, and it is also true that Dr. Bensi's treatment records alone provide little support for the manipulative limitations she endorsed. But in light of the record as a whole, including Wolfgram-Kennedy's reported limitations in performing fine motor activities, the ALJ's decision to discount Dr. Bensi's opinion about Wolfgram-Kennedys' manipulative limitations was not substantially supported. As for the other reasons the ALJ gave for discounting Dr. Bensi's opinion, there is no inherent inconsistency between an inability to *sustain* manipulative tasks for any length of time and Wolfgram-Kennedy's presentation as generally comfortable in her doctor's office or displaying generally normal sensory and motor function on a brief in-office exam.

The ALJ's error was not harmless, because giving controlling—or even partial— weight to Dr. Bensi's opinion for part of the relevant period could change the outcome. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (explaining that the harmless error

inquiry is whether the court can ALJ's decision might be different on remand). At the hearing, the VE identified several jobs an individual with Wolfgram-Kennedy's limitations could perform if she were limited to frequent fingering and handling, but he could identify only one job she could perform if limited to only occasional handling and fingering. (Tr. 58.) If limited to less than occasional handling and fingering—defined as less than ten percent of the day— that would eliminate all jobs. (Tr. 58–59.) Because this error could have changed the disability determination for the latter part of the relevant period, remand is appropriate.

### 2.2    Vocational Expert Testimony

Wolfgram-Kennedy also argues that the ALJ erroneously failed to establish the reliability of the job numbers the VE provided. (Docket # 19 at 23–27.) However, because the case is being remanded on other grounds, I need not address this argument.

## CONCLUSION

The ALJ failed to support with substantial evidence her decision to give little weight to the opinion of Wolfgram-Kennedy's treating provider, Dr. Bensi. Accordingly, the Commissioner's decision will be reversed and remanded pursuant to 42 U.S.C. § 405(g), sentence four.

10

# ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 5th day of June, 2020.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge